

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. _____** |
| | : | |
| **v.** | : | **Grand Jury Original** |
| | : | |
| **ARSALAN SHEMIRANI,** | : | **VIOLATIONS:** |
| | : | |
| **Defendant.** | : | **18 U.S.C. § 371** |
| | : | **(Conspiracy)** |
| | : | |
| | : | **50 U.S.C. § 1705** |
| | : | **(International Emergency** |
| | : | **Economic Powers Act)** |
| | : | |
| | : | **31 C.F.R. Part 560** |
| | : | **(Iranian Transactions** |
| | : | **Regulation)** |
| | : | |
| | : | **18 U.S.C. § 2** |
| | : | **(Aiding and Abetting and** |
| | : | **Causing an Act to Be Done)** |

Case: 1:12-cr-00075
Assigned To : Leon, Richard J.
Assign. Date : 3/22/2012
Description: INDICTMENT (B)

: **18 U.S.C. § 981(a)(1)(c)**
: **28 U.S.C. § 2461(c)**
: **(Criminal Forfeiture)**

## INDICTMENT

The Grand Jury charges that:

## COUNT ONE
### (Conspiracy to violate IEEPA and Defraud the United States)

At all times relevant to this Indictment:

## INTRODUCTION

1.    **ARSALAN SHEMIRANI**  (hereinafter "**SHEMIRANI**") was a citizen of Iran,

who resided in Canada.

2.    The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§

1701-1706, authorized the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the U.S. when the President declared a national emergency with respect to that threat. Pursuant to the authority under the IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

3.     Beginning with Executive Order No. 12170, issued on November 14, 1979, the President has found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

4.     On May 6, 1995, the President issued Executive Order No. 12959, adopting and continuing Executive Order No. 12170 (collectively, the "Executive Orders"), and prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the U.S. or by a U.S. person. The Executive Orders authorized the U.S. Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations ("ITR"), implementing the sanctions imposed by the Executive Orders.

5.     The ITR generally prohibited any person from exporting or causing to be exported from the U.S. any goods or technology without having first obtained a validated export license from the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia. The ITR imposed, among others, the following prohibitions:

> Section 560.203 - Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:

2

> Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.
>
> Section 560.204 - Prohibition of any Sale or Supply of any Goods, Technology, Services to Iran or the Iranian Government:
>
> Except as otherwise authorized [by a license issued by OFAC], the exportation, . . . sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, . . . sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:
>
> (a) Such goods, technology, or services are intended specifically for supply . . . directly or indirectly, to Iran or the Government of Iran . . .

6.      The Iran Trade Embargo and the ITR were in effect at all times relevant to this Indictment.

7.      At no time relevant to this Indictment, did defendant **SHEMIRANI** or any coconspirators, apply for, receive, or possess a license from OFAC to export goods, technology, or services to Iran of any kind.

8.      Pursuant to U.S. law and regulations, exporters, shippers, and freight forwarders were required to file certain forms and declarations concerning exports of goods and technology from the U.S. Typically, those documents were filed electronically through the Automated Export System ("AES"), which was administered by the U.S. Department of Homeland Security ("DHS"), Customs and Border Protection, which was headquartered in the District of Columbia.

9.      A Shipper's Export Declaration ("SED") was a document submitted to DHS in connection with export shipments from the U.S. These forms were used by the U.S. Bureau of Census to collect trade statistics and by the Bureau of Industry and Security ("BIS"), U.S.

Department of Commerce, which was located in the District of Columbia, for export control purposes.

10.     An essential and material part of the SED and AES, as well as other export filings, was information concerning the end-user or ultimate destination of the export. The identity of the end-user may determine whether the goods may be exported: (a) without any specific authorization from the U.S. Government; (b) with the specific authorization or license from the U.S. Department of the Treasury, U.S. Department of State, or U.S. Department of Commerce; or (c) whether the goods may be prohibited for export from the U.S.

11.     Statements made on these export filings were statements to the U.S. government that the transaction occurred as described. Other U.S. government agencies located in the District of Columbia and elsewhere also relied upon the information provided by AES records.

12.     The conduct alleged in this Indictment began outside of the jurisdiction of any particular State or district, and later occurred within the District of Columbia and elsewhere, and is therefore within the venue of the United States District Court for the District of Columbia, as provided by 18 U.S.C. §§ 3237(a) and 3238.

## THE CONSPIRACY

13.     Beginning as early as in or around February 2010, the exact date being unknown to the Grand Jury, and continuing through at least in or around November 2011, in the District of Columbia and elsewhere, the defendant, **SHEMIRANI**, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree with each other, to commit offenses against the U.S, that is, to export, reexport, sell, supply, or cause the export, reexport, sale, or supply, directly or indirectly of products, from the U.S. to Iran, in violation of the embargo imposed upon that country by the U.S., without first having obtained the

4

required licenses or authorizations from the U.S. Department of the Treasury, OFAC, in violation

of Title 50, U.S. Code, Section 1705 (IEEPA), and Title 31, Code of Federal Regulations, Parts

560.203 – 204 (ITR); and to defraud the U.S. Government by interfering with and obstructing a

lawful government function by deceit, craft, trickery, and dishonest means in violation of Title 18,

U.S. Code, Section 371.

## OBJECTS OF THE CONSPIRACY

14.    The objects of the conspiracy were:

   a.   to illegally enrich the conspirators;

   b.   to supply entities in Iran with products,

   c.   to evade the prohibitions and licensing requirements of IEEPA and ITR; and

   d.   to conceal the prohibited activities and transactions from detection by U.S.

        companies and the U.S. Government so as to avoid penalties and disruption of

        the illegal activities.

## MANNER AND MEANS OF THE CONSPIRACY

15.    The manner and means by which the defendant and his coconspirators sought to

accomplish the objects of the conspiracy included, among others, the following:

   a.    Defendant **SHEMIRANI** used email and other forms of communication

to communicate with other coconspirators, and with other individuals and entities located in the

U.S., Iran, and Asia.

   b.    **SHEMIRANI** received requests on behalf of Coconspirator A, who he

knew to be located in Iran, to purchase products from U.S. suppliers and direct the U.S. suppliers

to ship the products to **SHEMIRANI** in Canada, where he repackaged and/or reshipped the

items to Coconspirator B in Hong Kong, for further transshipment to Coconspirator A in Iran.

5

On occasion, the U.S. suppliers shipped the products **SHEMIRANI** ordered directly to Coconspirator B in Hong Kong, who then sent them to Iran.

      c.      **SHEMIRANI** made inquiries, placed orders, and facilitated the purchase of products located in the U.S. on behalf of **SHEMIRANI**'s Coconspirator A in Iran.

      d.      In order to avoid detection by the U.S. Government of their unlawful conduct, the defendant, **SHEMIRANI**, and his coconspirators concealed from the U.S. Government the true identity of the ultimate end-use and end-users in Iran of the U.S.-origin goods.

      e.      In order to avoid detection by the U.S. Government of their unlawful conduct, the defendant, **SHEMIRANI,** and his coconspirators utilized the services of individuals and companies based in Hong Kong to transship goods from the U.S. to Iran.

**OVERT ACTS**

      16.     In furtherance of this conspiracy, and to accomplish its purpose and object, at least one of the coconspirators committed and caused to be committed at least one of the following overt acts, among others:

**The Unlawful Export of U.S.-Origin M2585 Powered Camac Crate to Iran**

      a.      On or about February 12, 2010, **SHEMIRANI** wrote to an eBay seller located in the U.S. inquiring whether the product, a 16 Highland Technology M2585 Powered Camac Crate (hereinafter "M2585"), could be shipped directly to Hong Kong.

      b.      On or about March 16, 2010, **SHEMIRANI**, after having received notice from eBay that he was the winning purchaser of the M2585 and that he was to wire $1,250 plus shipping costs to an equipment and machinery company in El Paso, Texas, wrote to the seller to inquire further about shipping the products directly to Hong Kong.

6

      c.      On or about March 17, 2010, **SHEMIRANI** sent an email to the seller that provided the commercial address of Coconspirator B in Hong Kong.

      d.      On or about March 30, 2010, Coconspirator A in Iran wrote to **SHEMIRANI** asking the status of the M2585 purchase.

      e.      On or about April 6, 2010, **SHEMIRANI** wrote to Coconspirator A in Iran confirming that he had purchased the M2585 and stating that he would obtain a tracking number for the shipment.

      f.      On or about April 15, 2010, **SHEMIRANI** caused the M2585 to be exported from the United States to Hong Kong for further transshipment to Iran.

      g.      On or about April 15, 2010, **SHEMIRANI** caused an SED filed within the AES for the export of the M2585 to falsely state that the ultimate destination of the product was Hong Kong and that no U.S. export license was required.

### The Unlawful Export of U.S.-Origin Testing and Power Equipment to Iran

      h.      On or about March 1, 2010, **SHEMIRANI** wrote to another eBay seller located in the U.S. asking to purchase three products (Phillips Scientific 7145 Linear Gate/Mux Camac Module, HP Agilent 6632B System Power Supply, and HP 1900A Pulse Generator) for shipment to Hong Kong.

      i.      On or about March 1, 2010, **SHEMIRANI** sent an email to the seller providing the commercial address of Coconspirator B in Hong Kong.

      j.      On or about March 10, 2010, **SHEMIRANI**, after eBay confirmed that he was the winning bidder for the three products and provided the address of a company in Maryland, wrote to the company in Maryland notifying it that he had purchased the three items and discussing shipping costs.

k.      On or about March 27, 2010, Coconspirator B in Hong Kong communicated with Coconspirator A in Iran, stating that he had received some items from the company in Maryland.

l.      On or about March 29, 2010, in response to the above March 27, 2010, communication, Coconspirator A in Iran sent an email to **SHEMIRANI** stating , "We got the attachment items from your side…. I need to clear this case today and arrange air shipment for this part to Iran!"

m.      On or about October 25, 2010, Coconspirator B in Hong Kong sent an email with the subject line, "Protect ourself [sic]!!" to Coconspirator A in Iran, that attached a news article about U.S. law enforcement's efforts to arrest non-U.S. citizens engaged in violations of U.S. export laws and that stated:

> As i read more news today about buying export controlled parts from USA AND the person was arrested by USA FBI. i again remind you, myself and [**SHEMIRANI**] !! two Chinese followed into trap of FBI, and were arrested at Hungary and then passed to USA…. USA have ever arrested a chinese lady because he inquiried a export-controlled parts! no any actual buy. just inquiry. also they arrested people not only for people going to USA, some USA-FRIEND company also help them on this. hope you can be reminded and also ask [**SHEMIRANI**] buy goods from [U.S. company] or any other channel use a differnet name, not as his passport name!! in above news, this guy at first was not arrested because FBI wrong spelling of this name but later FBI still use a business trap to arrest him!! [sic]

n.      On or about October 25, 2010, Coconspirator A in Iran sent an email to Coconspirator B and **SHEMIRANI** that contained the above email with the subject line, "Protect ourself [sic]!!," and that responded to Coconspirator B as follows:

8

You are right ! Thanks for your mention and all of us we must be careful . For our biz during this year we are working safe and we try to control all side !  . . . As you know we usually get the inq from end-user directly and we are make sure inq is not follow by other's . Any way , you and me and [**SHEMIRANI**] al must be carful for this kind of inq.  [sic]

### The Unlawful Export of U.S.-Origin
### Tennelec, Ortec and Canberra Power Equipment to Iran

o.     On or about June 28, 2011, **SHEMIRANI** sent an email through eBay to an eBay seller located in New Mexico asking to purchase several items, including a Tennelec TB3 NIM Bin Crate with 7911 Power Supply, an Ortec 552 Pulse-Shape Analyzer/Timing SCA NIM Module, and a Canberra 3105 H.V. Power Supply NIM Bin Crate Module (hereinafter "Power Equipment"), and inquiring about shipping these products to Canada or Hong Kong.

p.     On or about July 8, 2011, **SHEMIRANI** sent an email to the Power Equipment seller that instructed it to ship the items to Coconspirator B in Hong Kong and not to include the invoice in the package being shipped to Hong Kong.

q.     On or about July 8, 2011, **SHEMIRANI** sent an email to the Power Equipment seller that stated that he had paid for the Power Equipment.

r.     On or about July 17, 2011, **SHEMIRANI** caused the Power Equipment to be exported from the United States to Hong Kong for further transshipment on to Iran.

s.     On or about July 17, 2011, **SHEMIRANI** caused an SED filed within the AES for the export of the above-referenced Power Equipment to falsely state that the ultimate destination of the equipment was Hong Kong and that no license was required.

t.     On or about July 28, 2011, Coconspirator B in Hong Kong notified Coconspirator A in Iran that Coconspirator B had received products the previous week that **SHEMIRANI** had purchased and that those products, including the Power Equipment, had been

9

shipped to Iran.

u.      On or about August 8, 2011, Coconspirator A in Iran notified

**SHEMIRANI** that the Power Equipment had been received.

(**Conspiracy to Commit an Offense against the U.S. and to Defraud the U.S.,** in violation of
Title 18, U.S. Code, Section 371.)

## COUNT TWO through FOUR
### (Unlawful Exports or Attempted Unlawful Exports of U.S.-origin Goods to Iran)

17.     The allegations in Paragraphs 1 through 12, and 14 through 16, are incorporated

and realleged by reference in this Count.

18.     On or about the dates listed below as to each count, in the District of Columbia

and elsewhere, the defendant, **SHEMIRANI**, did knowingly and willfully violate the embargo

against Iran by exporting and attempting to export from the U.S. various products, as described

more fully in Counts 2 through 4, to Iran, without first having obtained the required licenses and

authorizations from the U.S. Department of the Treasury's OFAC, located in the District of

Columbia:

| COUNT | DATE | PRODUCT |
|:-----:|:----:|:-------:|
| 2 | April 15, 2010 | 16 Highland Technology M2585 Powered Camac Crate |
| 3 | March 27, 2010 | Phillips Scientific 7145 Linear Gate/Mux Camac Module, HP Agilent 6632B System Power Supply, and HP 1900A Pulse Generator |
| 4 | July 17, 2011 | Tennelec TB3 NIM Bin Crate with 7911 Power Supply, Ortec 552 Pulse-Shape Analyzer/Timing SCA NIM Module, and Canberra 3105 H.V. Power Supply NIM Bin Crate Module |

(**Unlawful Exports or Attempted Exports of U.S.-Origin Goods to Iran**, in violation of Title
50, U.S. Code, Section 1705; Title 31, Code of Federal Regulations, Sections 560.203 and
560.204; **Aiding and Abetting and Causing an Act to be Done**, in violation of Title 18, U.S.
Code, Section 2.)

## **FORFEITURE ALLEGATION**

19.     The violations alleged in Count One through Count Four of this Indictment are re-alleged and incorporated by reference herein for the purpose of alleging forfeiture to the U.S. pursuant to the provisions of Title 18, U.S. Code, Section 981(a)(1)(C), and Title 28, U.S. Code, Section 2461(c).

20.     As a result of the offenses alleged in Count One through Count Four of this Indictment, defendants shall forfeit to the U.S. any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the offenses alleged in Count One through Count Four, including, but not limited to:

Money Judgment:

judgment in favor of the U.S. for a sum of money equal to the value of the property constituting or derived from, any and all proceeds the defendants obtained, directly or indirectly, as a result of the offenses alleged in Count One through Count Four of this Indictment.

21.     By virtue of the commission of the felony offenses charged in Count One through Count Four of this Indictment, any and all interest that defendants have in property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such offenses is vested in the U.S. and hereby forfeited to the U.S. pursuant to Title 18, U.S. Code, Section 981(a)(1)(C) and Title 28, U.S. Code, Section 2461(c).  If, as a result of any act or omission of the defendants, the property identified above:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

11

(d) has been substantially diminished in value; or

(e) has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the U.S., pursuant to Title 18, U.S. Code, Section 982(b)(1), incorporating by reference Title 21, U.S. Code, Section 853(p), to seek forfeiture of any other property of the said defendants up to the value of said property listed above as being subject to forfeiture.

(**Criminal Forfeiture**, in violation of Title 18, U.S. Code, Section 981(a)(1)(C) and Title 28, U.S. Code, Section 2461(c).)

A TRUE BILL

FOREPERSON

/s/
Attorney of the United States in
and for the District of Columbia

12