IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 12-075 (RJL) |
| v. | |
| ARSALAN SHEMIRANI, | VIOLATIONS: |
| Defendant. | 18 U.S.C. § 371 (Conspiracy) |
| | 50 U.S.C. § 1705 (International Emergency Economic Powers Act) |
| | 31 C.F.R. Part 560 (Iranian Transactions Regulation) |
| | 18 U.S.C. § 2 (Aiding and Abetting and Causing an Act to Be Done) |
| | 18 U.S.C. § 1001 (False Statements) |
| | 18 U.S.C. § 981(a)(1)(c) 28 U.S.C. § 2461(c) (Criminal Forfeiture) |

## INDICTMENT

The Grand Jury charges that:

### COUNT ONE
(Conspiracy to violate IEEPA and Defraud the United States)

At all times relevant to this Indictment:

### INTRODUCTION

1.  **ARSALAN SHEMIRANI** (hereinafter "**SHEMIRANI**") was a citizen of Iran, who resided in Canada.

2.      The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declares a national emergency with respect to that threat. Pursuant to the authority under the IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

3.      Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

4.      On May 6, 1995, the President issued Executive Order No. 12959, adopting and continuing Executive Order No. 12170 (collectively, the "Executive Orders"), and prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the U.S. or by a U.S. person. The Executive Orders authorized the U.S. Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations ("ITR"), implementing the sanctions imposed by the Executive Orders.

5.      The ITR generally prohibited any person from exporting or causing to be exported from the U.S. any goods or technology without having first obtained an export license from the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia. The ITR imposed, among others, the following prohibitions:

> Section 560.203 - Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:
>
> Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.
>
> Section 560.204 - Prohibition of any Sale or Supply of any Goods, Technology, Services to Iran or the Iranian Government:
>
> Except as otherwise authorized [by a license issued by OFAC], the exportation, . . . sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, . . . sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:
>
> > (a)   Such goods, technology, or services are intended specifically for supply . . . directly or indirectly, to Iran or the Government of Iran . . .

6. The Iran Trade Embargo and the ITR were in effect at all times relevant to this Indictment.

7. At no time relevant to this Indictment did defendant **SHEMIRANI** or any coconspirators, apply for, receive, or possess a license from OFAC to export goods, technology, or services to Iran of any kind.

8. Pursuant to U.S. law and regulations, exporters, shippers, and freight forwarders were required to file certain forms and declarations concerning exports of goods and technology from the U.S. Typically, those documents were filed electronically through the Automated Export System ("AES"), which was administered by the U.S. Department of Homeland Security ("DHS"), Customs and Border Protection, which was headquartered in the District of Columbia.

9. A Shipper's Export Declaration ("SED") was a document submitted to DHS in connection with export shipments from the U.S. These forms were used by the U.S. Bureau of

Census to collect trade statistics and by the Bureau of Industry and Security ("BIS"), U.S. Department of Commerce, which was located in the District of Columbia, for export control purposes.

10. An essential and material part of the SED and AES, as well as other export filings, was information concerning the end-user or ultimate destination of the export. The identity of the end-user may determine whether the goods may be exported: (a) without any specific authorization from the U.S. Government; (b) with the specific authorization or license from the U.S. Department of the Treasury, U.S. Department of State, or U.S. Department of Commerce; or (c) whether the goods may be prohibited for export from the U.S.

11. Statements made on these export filings were statements to the U.S. government that the transaction occurred as described. Other U.S. government agencies located in the District of Columbia and elsewhere also relied upon the information provided by AES records.

12. The conduct alleged in this Count began outside of the jurisdiction of any particular State or district, and later occurred within the District of Columbia and elsewhere, and is therefore within the venue of the United States District Court for the District of Columbia, as provided by 18 U.S.C. §§ 3237(a) and 3238.

## THE CONSPIRACY

13. Beginning as early as in or around January 2010, the exact date being unknown to the Grand Jury, and continuing through at least in or around November 2011, in the District of Columbia and elsewhere, the defendant, **SHEMIRANI**, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree with each other, to commit offenses against the U.S, that is, to export, reexport, sell, supply, or cause the export, reexport, sale, or supply, directly or indirectly of products from the U.S. to Iran, in

violation of the embargo imposed upon that country by the U.S., without first having obtained the required licenses or authorizations from the U.S. Department of the Treasury, OFAC, in violation of Title 50, U.S. Code, Section 1705 (IEEPA), and Title 31, Code of Federal Regulations, Parts 560.203 – 204 (ITR); and to defraud the U.S. Government by interfering with and obstructing a lawful government function by deceit, craft, trickery, and dishonest means in violation of Title 18, U.S. Code, Section 371.

## OBJECTS OF THE CONSPIRACY

14. The objects of the conspiracy were:

   a. to illegally enrich the conspirators;

   b. to supply entities in Iran with products;

   c. to evade the prohibitions and licensing requirements of IEEPA and ITR; and

   d. to conceal the prohibited activities and transactions from detection by U.S. companies and the U.S. Government so as to avoid penalties and disruption of the illegal activities.

## MANNER AND MEANS OF THE CONSPIRACY

15. The manner and means by which the defendant and his coconspirators sought to accomplish the objects of the conspiracy included, among others, the following:

   a. Defendant **SHEMIRANI** used email and other forms of communication to communicate with other coconspirators, and with other individuals and entities located in the U.S., Iran, and Asia.

   b. **SHEMIRANI** received requests on behalf of Coconspirator A, who he knew to be located in Iran, to purchase products from U.S. suppliers and direct the U.S. suppliers

to ship the products to **SHEMIRANI** in Canada, where **SHEMIRANI** repackaged and/or reshipped the items to Coconspirator B and Coconspirator B's company in Hong Kong, for further transshipment to Coconspirator A in Iran. On occasion, the U.S. suppliers shipped the products **SHEMIRANI** ordered directly to Coconspirator B and Coconspirator B's company in Hong Kong, who then sent them to Iran.

   c. **SHEMIRANI** made inquiries, placed orders, and facilitated the purchase of products located in the U.S. on behalf of Coconspirator A in Iran.

   d. In order to avoid detection by the U.S. Government of their unlawful conduct, **SHEMIRANI** and his coconspirators concealed from the U.S. Government the true identity of the ultimate end-use and end-users in Iran of the U.S.-origin goods.

   e. In order to avoid detection by the U.S. Government of their unlawful conduct, the defendant, **SHEMIRANI,** and his coconspirators utilized the services of individuals and companies based in Hong Kong to transship goods from the U.S. to Iran.

   f. **SHEMIRANI** made and caused to be made materially false information to be placed on documents such as SEDs and in filings on AES and made materially false statements to law enforcement agents investigating this illegal scheme.

## OVERT ACTS

16. In furtherance of this conspiracy, and to accomplish its purpose and object, at least one of the coconspirators committed and caused to be committed at least one of the following overt acts, among others:

### The Unlawful Export of U.S.-Origin Field Programmable Gate Array Microchips and Electronic Components to Iran

   a. On or about January 26, 2010, Coconspirator A sent **SHEMIRANI** an email requesting that **SHEMIRANI** purchase from an electronics company located in Texas

("Texas company") three types of field-programmable gate array microchips for shipment to Iran. Field-programmable gate array microchips are integrated circuits designed to be configured by a customer after manufacturing, and have a wide range of potential applications, including digital signal processing, aerospace and defense systems, medical imaging, and cryptography.

      b.      On or about February 3, 2010, **SHEMIRANI**, after receiving a price quote from the Texas company for the three types of microchips, asked the Texas company to provide price quotations for two additional types of microchips.

      c.      On or about February 24, 2010, **SHEMIRANI** drafted an order to purchase from the Texas company quantities of three types of microchips, totaling $79,201.26; the order purported to come from **SHEMIRANI**'s employer in Canada, but **SHEMIRANI** directed that the microchips be sent to an address which was **SHEMIRANI**'s residence in Canada.

      d.      On or about February 26, 2010, Coconspirator B wrote an email to **SHEMIRANI**, sending a copy to Coconspirator A, in which he warned that these particular microchips required an export license by the "USA government" and verification of the end user of the product because "they want to control the parts where to be used."

      e.      On or about March 3, 2010, **SHEMIRANI**, after having been asked by the Texas company's sales representative where the microchips would be used, falsely stated that the microchips were destined for **SHEMIRANI**'s employer, a company located in Canada; the microchips would be used in a "lab environment"; and that he did not want to use his Canadian company's credit card due to financial complications.

      f.      On or about March 4, 2010, **SHEMIRANI** wrote to the Texas company

requesting price quotes for two additional electronic components.

    g.    On or about March 9, 2010, **SHEMIRANI** sent to the Texas company a non-cancellable, non-returnable order for five types of microchips and electronic components totaling $83,729.26.

    h.    On or about March 10, 2010, **SHEMIRANI**, after receiving an email from the Texas company confirming that the microchips **SHEMIRANI** had ordered were export controlled and required an end-user/end-use certificate, returned to the Texas company a completed certificate signed by **SHEMIRANI** that falsely claimed that the "End Use and ultimate destination of product" was "Lab Environment, Montreal, Quebec Canada."

    i.    On or about March 19, 2010, Coconspirator A sent **SHEMIRANI** an email asking him to ship the products that he had received from various companies located in the United States, including the Texas company, "today to Hong Kong!" and stating that "[w]e need to collect with other goods and ship them to Iran."

    j.    On or about March 22, 2010, Coconspirator A told **SHEMIRANI** that he would arrange payment for the microchips and electronic components the following week.

    k.    On or about April 20, 2010, **SHEMIRANI** wrote to the Texas company asking for account information in order to wire the company approximately $60,000 for the order of microchips and electronic components.

    l.    On or about April 23, 2010, **SHEMIRANI** wired $60,000 from Canada to the Texas company's bank in the United States.

    m.    On or about June 24, 2010, **SHEMIRANI**, after being asked by the Texas company about the outstanding balance due on the order, responded to the Texas company that **SHEMIRANI** would make full payment the next day.

n. On or about June 25, 2010, **SHEMIRANI** wired the remaining money due, $23,729.26, from Canada to the Texas company's bank in the United States.

o. On or about July 1, 2010 through on or about July 27, 2010, **SHEMIRANI** caused the Texas company to export microchips and electronic components from the United States to **SHEMIRANI**'s place of employment in Canada, for the purpose of transshipping the microchips to Iran through Hong Kong.

### The Unlawful Export of U.S.-Origin M2585 Powered Camac Crate to Iran

p. On or about February 12, 2010, **SHEMIRANI** wrote to an eBay seller located in the U.S., inquiring whether the product, a 16 Highland Technology M2585 Powered CAMAC Crate (hereinafter "M2585"), could be shipped directly to Hong Kong. A Computer Automated Measurement and Control (CAMAC) crate is a modular data handling system that interacts with a computer and permits information to be transferred into and out of a wide range of instruments which connect to a standardized backplane. Such crates are used at nuclear physics research laboratories and many industrial sites around the world.

q. On or about March 16, 2010, **SHEMIRANI**, after having received notice from eBay that he was the winning purchaser of the M2585 and that he was to wire $1,250 plus shipping costs to an equipment and machinery company in El Paso, Texas, wrote to the seller to inquire further about shipping the products directly to Hong Kong.

r. On or about March 17, 2010, **SHEMIRANI** sent an email to the seller that provided the commercial address of Coconspirator B in Hong Kong.

s. On or about March 30, 2010, Coconspirator A in Iran wrote to **SHEMIRANI** asking about the status of the M2585 purchase.

t. On or about April 6, 2010, **SHEMIRANI** wrote to Coconspirator A in

9

Iran confirming that he had purchased the M2585 and stating that he would obtain a tracking number for the shipment.

  u. On or about April 15, 2010, **SHEMIRANI** caused an SED filed within the AES for the export of the M2585 to falsely state that the ultimate destination of the product was Hong Kong and that no U.S. export license was required.

  v. On or about April 15, 2010, **SHEMIRANI** caused the M2585 to be exported from the United States to Hong Kong for further transshipment to Iran.

### The Unlawful Export of U.S.-Origin Testing and Power Equipment to Iran

  w. On or about March 1, 2010, **SHEMIRANI** wrote to another eBay seller located in the U.S. asking to purchase three products (Phillips Scientific 7145 Linear Gate/Mux CAMAC Module, HP Agilent 6632B System Power Supply, and HP 1900A Pulse Generator) for shipment to Hong Kong. Pulse generators are frequently used either to power timed trigger devices in electronic circuits or as electronic test and measurement devices that confirm the proper operation of an electronic system or pinpoint a fault in the system. They have a variety of industrial and laboratory uses.

  x. On or about March 1, 2010, **SHEMIRANI** sent an email to the seller providing the commercial address of Coconspirator B in Hong Kong.

  y. On or about March 10, 2010, **SHEMIRANI**, after eBay confirmed that he was the winning bidder for the three products and provided the address of the company in Maryland that was selling the products, wrote to the company in Maryland notifying it that he had purchased the three items and discussing shipping costs.

  z. On or about March 27, 2010, Coconspirator B in Hong Kong communicated with Coconspirator A in Iran, stating that he had received some items from the

company in Maryland.

aa. On or about March 29, 2010, in response to the above March 27, 2010, communication, Coconspirator A in Iran sent an email to **SHEMIRANI** stating, "We got the attachment items from your side.... I need to clear this case today and arrange air shipment for this part to Iran!"

### The Unlawful Export of U.S.-Origin Semiconductors and Analog Devices to Iran

bb. On or about May 4, 2010, Coconspirator A wrote to **SHEMIRANI** and Coconspirator B, asking **SHEMIRANI** to order 100 acceleration sensor semiconductors and 36 analog converters from a company located in Illinois ("Illinois company"). Acceleration sensor semiconductors are components often used in devices that are designed to measure changes in force, speed or positioning. Analog converters typically convert a continuous quantity of electronic current to a discrete time representation in digital form or provide an isolated measurement such as an electronic device that converts an input analog voltage to a digital number proportional to the magnitude of the voltage. These converters are used in many applications when an analog signal has to be processed, stored, or transported in digital form, such as in microcontrollers, oscilloscopes and software-defined radio.

cc. On or about May 4, 2010, **SHEMIRANI** ordered 100 acceleration sensor semiconductors and 36 analog converters from the Illinois company, requesting that the Illinois company ship the items to Coconspirator B's company in Hong Kong, and bill that company for the items.

dd. On or about May 4, 2010, **SHEMIRANI** received a response from the Illinois company stating that **SHEMIRANI**'s order had been canceled because the items **SHEMIRANI** ordered "have export restrictions and cannot be shipped to your location," which

11

**SHEMIRANI** had listed as Hong Kong.

ee. On or about May 5, 2010, **SHEMIRANI** reordered 100 acceleration sensor semiconductors and 36 analog converters from the Illinois company, stating that the shipment and bill should be sent to Montreal, Canada.

ff. In or around May and June 2010, **SHEMIRANI** caused the Illinois company to ship acceleration sensor semiconductors and analog converters to **SHEMIRANI** in Canada, for the purpose of transshipping the microchips to Iran through Hong Kong.

gg. On or about June 8, 2010, Coconspirator A sent an email to **SHEMIRANI** stating that Coconspirator A in Iran had only received 76 acceleration sensor semiconductors of the 100 that Coconspirator A had ordered, and 26 of the 36 analog converters that he had ordered.

### The Unlawful Export of U.S.-Origin Electronic Connectors and Plugs to Iran

hh. On or about July 1, 2010, Coconspirator A sent an email to **SHEMIRANI** asking that **SHEMIRANI** order 76 electronic connectors and 40 plugs from the Illinois company.

ii. In or around July 2010, **SHEMIRANI** ordered electronic connectors and plugs from the Illinois company, directing the company to ship the parts to **SHEMIRANI**'s place of employment in Montreal, Canada.

jj. From in or around July 2010 through October 2010, **SHEMIRANI** caused the Illinois company to export the three shipments of electronic connectors and plugs from the United States to **SHEMIRANI**'s place of employment in Canada, for the purpose of transshipping the parts to Iran through Hong Kong.

kk. On or about October 25, 2010, Coconspirator B in Hong Kong sent an

email with the subject line, "Protect ourself [sic]!!" to Coconspirator A in Iran, that attached a news article about U.S. law enforcement's efforts to arrest non-U.S. citizens engaged in violations of U.S. export laws and that stated:

> As i read more news today about buying export controlled parts from USA AND the person was arrested by USA FBI. i again remind you, myself and [SHEMIRANI] !! two Chinese followed into trap of FBI, and were arrested at Hungary and then passed to USA.... USA have ever arrested a chinese lady because he inquiried a export-controlled parts! no any actual buy. just inquiry. also they arrested people not only for people going to USA, some USA-FRIEND company also help them on this. hope you can be reminded and also ask [SHEMIRANI] buy goods from [U.S. company] or any other channel use a differnet name, not as his passport name!! in above news, this guy at first was not arrested because FBI wrong spelling of this name but later FBI still use a business trap to arrest him!! [sic]

ll.   On or about October 25, 2010, Coconspirator A in Iran sent an email to Coconspirator B and **SHEMIRANI** that contained the above email with the subject line, "Protect ourself [sic]!!," and that responded to Coconspirator B as follows:

> You are right ! Thanks for your mention and all of us we must be careful . For our biz during this year we are working safe and we try to control all side !  ... As you know we usually get the inq from end-user directly and we are make sure inq is not follow by other's . Any way , you and me and [SHEMIRANI] al must be carful for this kind of inq. [sic]

mm.   On or about October 27, 2010, Coconspirator A asked **SHEMIRANI** to send Coconspirator A the invoices from the Illinois company related to the purchase of the electronic parts, as well as the documentation of their shipment from Canada to Hong Kong.

nn.   On or about October 27, 2010, **SHEMIRANI** sent Coconspirator A the Illinois company's invoices and the shipping documents that related to the export of the electronic parts **SHEMIRANI** purchased from the Illinois company for Coconspirator A in Iran.

oo.   On or about October 28, 2010, Coconspirator A complained to **SHEMIRANI** that **SHEMIRANI**'s documentation had discrepancies and that there was still a

13

shortage of four parts that Coconspirator A had ordered but had never received.

### The Unlawful Export of U.S.-Origin Tennelec, Ortec and Canberra Power Equipment to Iran

pp.     On or about June 28, 2011, **SHEMIRANI** sent an email through eBay to an eBay seller located in New Mexico asking to purchase several items, including a Tennelec TB3 NIM Bin Crate with 7911 Power Supply, an Ortec 552 Pulse-Shape Analyzer/Timing SCA NIM Module, and a Canberra 3105 H.V. Power Supply NIM Bin Crate Module (hereinafter "Power Equipment"), and inquiring about shipping these products to Canada or Hong Kong. Nuclear Instrument Module (NIM) defines mechanical and electrical specifications for electronics modules used in experimental particle and nuclear physics, and provides a common footprint for electronic modules (e.g., analog converters, and amplifiers), which plug into a larger chassis, crate or bin, that supplies power to the modules via a backplane. NIM crates are widely used for amplifiers, nuclear pulse generators and other logic modules that do not require digital data communication but benefit from a backplane connector that is suited for high power use. Pulse shape analyzers are frequently used to detect and measure electron and radiation signatures.

qq.     On or about July 8, 2011, **SHEMIRANI** sent an email to the Power Equipment seller that instructed it to ship the items to Coconspirator B in Hong Kong and not to include the invoice in the package being shipped to Hong Kong.

rr.     On or about July 8, 2011, **SHEMIRANI** sent an email to the Power Equipment seller that stated that he had paid for the Power Equipment.

ss.     On or about July 17, 2011, **SHEMIRANI** caused an SED filed within the AES for the export of the above-referenced Power Equipment to falsely state that the ultimate destination of the equipment was Hong Kong and that no license was required.

tt.   On or about July 17, 2011, **SHEMIRANI** caused the Power Equipment to be exported from the United States to Hong Kong for further transshipment on to Iran.

uu.   On or about July 28, 2011, Coconspirator B in Hong Kong notified Coconspirator A in Iran that Coconspirator B had received products the previous week that **SHEMIRANI** had purchased and that those products, including the Power Equipment, had been shipped to Iran.

vv.   On or about August 8, 2011, Coconspirator A in Iran notified **SHEMIRANI** that the Power Equipment had been received.

**(Conspiracy to Commit an Offense against the U.S. and to Defraud the U.S. and Violate IEEPA, in violation of Title 18, U.S. Code, Section 371.)**

## COUNTS TWO through ELEVEN
**(Unlawful Exports and Attempted Unlawful Exports of U.S.-origin Goods to Iran)**

17.   The allegations in Paragraphs 1 through 12, and 14 through 16, are incorporated and realleged by reference in this Count.

18.   On or about the dates listed below as to each count, in the District of Columbia and elsewhere, the defendant, **SHEMIRANI**, did knowingly and willfully violate the embargo against Iran by exporting and attempting to export from the U.S. various products, as described more fully in Counts 2 through 11, to Iran, by way of Canada and Hong Kong, without first having obtained the required licenses and authorizations from the U.S. Department of the Treasury's OFAC, located in the District of Columbia:

| COUNT | APPROXIMATE DATE OF EXPORT | PRODUCT |
|---|---|---|
| 2 | July 1 – July 27, 2010 | Microchips and Electronic Components |
| 3 | April 15, 2010 | 16 Highland Technology M2585 Powered Camac Crate |

| 4 | March 27, 2010 | Phillips Scientific 7145 Linear Gate/Mux Camac Module, HP Agilent 6632B System Power Supply, and HP 1900A Pulse Generator |
|---|---|---|
| 5 | May 5, 2010 | Semiconductors and Analog Devices |
| 6 | May 19, 2010 | Semiconductors and Analog Devices |
| 7 | June 7, 2010 | Semiconductors and Analog Devices |
| 8 | July 29, 2010 | Electronic Connectors and Plugs |
| 9 | August 12, 2010 | Electronic Connectors and Plugs |
| 10 | October 29, 2010 | Electronic Connectors and Plugs |
| 11 | July 17, 2011 | Tennelec TB3 NIM Bin Crate with 7911 Power Supply, Ortec 552 Pulse-Shape Analyzer/Timing SCA NIM Module, and Canberra 3105 H.V. Power Supply NIM Bin Crate Module |

(**Unlawful Exports and Attempted Exports of U.S.-Origin Goods to Iran**, in violation of Title 50, U.S. Code, Section 1705; Title 31, Code of Federal Regulations, Sections 560.203 and 560.204; **Aiding and Abetting and Causing an Act to be Done**, in violation of Title 18, U.S. Code, Section 2.)

## COUNTS TWELVE and THIRTEEN
(Material False Statements)

19. The allegations in Paragraphs 1 through 11 of this Indictment are incorporated and re-alleged by reference herein.

20. On or about the dates listed as to each count below, within the District of Columbia and elsewhere, **SHEMIRANI**, in a matter within the jurisdiction of the United States Department of Homeland Security, Customs and Border Protection, and the United States Department of Commerce, Bureau of Industry and Security, both of which are located in the District of Columbia, did knowingly and willfully falsify, conceal, and cover up and cause to be falsified, concealed, and covered up, by a trick, scheme, and device, material facts; and made and

caused to be made false, fictitious and fraudulent statements and representations as to a material fact; and made and used and caused to be made or used a false writing and document knowing the same to contain a false, fictitious and fraudulent entry, by causing false and fictitious shipping documents to be created, including Shipper's Export Declarations ("SEDs"), which stated that the ultimate consignee of the products being exported from the United States was Coconspirator B's company in Hong Kong, and the ultimate destination of the products was Hong Kong, and that no export license was required, when **SHEMIRANI**, there and then knew well that these statements were false.

| Count | Approx. Export Date | Approx. SED Filing Date | PRODUCT | Ultimate Consignee and Destination Stated on SED | Ultimate Consignee and Destination for Actual Shipment |
|---|---|---|---|---|---|
| 12. | April 15, 2010 | April 15, 2010 | 16 Highland Technology M2585 Powered Camac Crate | Coconspirator B's company, Hong Kong | Coconspirator A, Tehran, Iran |
| 13. | July 17, 2011 | July 17, 2011 | Tennelec TB3 NIM Bin Crate with 7911 Power Supply, Ortec 552 Pulse-Shape Analyzer/Timing SCA NIM Module, and Canberra 3105 H.V. Power Supply NIM Bin Crate Module | Coconspirator B's company, Hong Kong | Coconspirator A, Tehran, Iran |

**(Material False Statements, in violation of 18 U.S.C. § 1001; Aiding and Abetting and Causing an Act to be Done, in violation of 18 U.S.C. § 2.)**

## COUNT FOURTEEN
### (Material False Statements)

21. The allegations in Paragraphs 1 through 11, and 15 of this Indictment are incorporated and re-alleged by reference herein.

22. On or about March 15, 2012, within the District of Columbia and elsewhere, **SHEMIRANI**, in a matter within the jurisdiction of the United States Department of Homeland Security, which is located in the District of Columbia, did knowingly and willfully falsify, conceal and cover up by trick, scheme and device material facts, and did make materially false, fictitious and fraudulent statements and representations to Special Agents employed by the United States Department of Homeland Security, namely, the following:

| Count 14 | False Statement |
|---|---|
| a. | **SHEMIRANI** stated that he was looking to get involved in the import/export business and learned of the existence of Coconspirator B's company in Hong Kong from a website, Craigslist.Org, when **SHEMIRANI** well knew that, in truth and fact, **SHEMIRANI** learned of Coconspirator B's company through Coconspirator A in Iran. |
| b. | **SHEMIRANI** stated that Coconspirator B in Hong Kong was the person who placed the orders for electronic parts and sent electronic mail messages to **SHEMIRANI** asking that **SHEMIRANI** purchase the parts, when **SHEMIRANI** well knew that, in truth and fact, Coconspirator A in Iran was the person who placed the orders with **SHEMIRANI** for electronic parts and sent electronic mail messages to **SHEMIRANI** asking that **SHEMIRANI** purchase the parts. |
| c. | **SHEMIRANI** stated that **SHEMIRANI**'s family members were not aware that he was working with Coconspirator B's company, when **SHEMIRANI** well knew that, in truth and fact, Coconspirator A, a member of **SHEMIRANI**'s family, was the individual who introduced **SHEMIRANI** to Coconspirator B and directed **SHEMIRANI** to ship products to Coconspirator B and Coconspirator B's company. |

| Count 14 | False Statement |
|---|---|
| d. | **SHEMIRANI** stated that if a company asked for end user information, **SHEMIRANI** would not order products from that company, when **SHEMIRANI** well knew that, in truth and fact, **SHEMIRANI** provided false end user information to companies which asked **SHEMIRANI** for end user information and **SHEMIRANI** ordered, purchased and transshipped products purchased from these companies. |
| | |

**(Material False Statements, in violation of 18 U.S.C. § 1001)**

## FORFEITURE ALLEGATION

23. The violations alleged in Count One through Count Eleven of this Indictment are re-alleged and incorporated by reference herein for the purpose of alleging forfeiture to the U.S. pursuant to the provisions of Title 18, U.S. Code, Section 981(a)(1)(C), and Title 28, U.S. Code, Section 2461(c).

24. As a result of the offenses alleged in Count One through Count Eleven of this Indictment, defendants shall forfeit to the U.S. any property constituting or derived from proceeds obtained directly or indirectly as the result of the offenses alleged in Count One through Count Eleven, including, but not limited to:

Money Judgment:

judgment in favor of the U.S. for a sum of money equal to the value of the property constituting or derived from any and all proceeds the defendants obtained directly or indirectly, as a result of the offenses alleged in Count One through Count Eleven of this Indictment.

25. By virtue of the commission of the felony offenses charged in Count One through Count Eleven of this Indictment, any and all interest that defendants have in property

constituting or derived from proceeds obtained directly or indirectly as the result of such offenses is vested in the U.S. and hereby forfeited to the U.S. pursuant to Title 18, U.S. Code, Section 981(a)(1)(C) and Title 28, U.S. Code, Section 2461(c). If, as a result of any act or omission of the defendants, the property identified above:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the U.S., pursuant to Title 18, U.S. Code, Section 982(b)(1), incorporating by reference Title 21, U.S. Code, Section 853(p), to seek forfeiture of any other property of the said defendants up to the value of said property listed above as being subject to forfeiture.

(**Criminal Forfeiture**, in violation of Title 18, U.S. Code, Section 981(a)(1)(C) and Title 28, U.S. Code, Section 2461(c))

A TRUE BILL

FOREPERSON

Ronald C. Machen Jr. /JIB
Attorney of the United States in
and for the District of Columbia