IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **UNDER SEAL** |
| | : | |
| v. | : | **CRIMINAL NO. 12-CR-0075 (RJL)** |
| | : | |
| ARSALAN SHEMIRANI | : | |
| | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Defendant Arsalan Shemirani has pled guilty to Count One of the Superseding Indictment arising from his role in a conspiracy to export U.S. origin electronic goods from the United States to Iran, through Hong Kong. Specifically, Count One charges him with conspiring under 18 U.S.C. § 371 to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705. For the reasons stated herein, in the Government's Motion for a Departure under 5K, and for any additional reasons offered at the sentencing hearing, the government requests that the defendant be sentenced to 36 months incarceration.

### Background

In accordance with Mr. Shemirani's plea and factual proffer, he acknowledges that as early as January 2010 and continuing through at least November 2011, he conspired with his brother, Amir Shemirani ("Amir") and a third individual, Adam Lee ("Lee"), to purchase U.S.-origin products from U.S. suppliers and to export or cause the export of those products from the U.S. to Iran via Canada and Hong Kong. The defendant, who is a citizen of Iran and was residing in Canada during the time of the conspiracy, received purchase requests from Amir. Amir resided and operated an electronics supply business in Tehran, Iran. Amir requested that the defendant

purchase various products from U.S. suppliers and direct the U.S. suppliers to ship the products to the defendant in Canada.   After receiving the goods, the defendant repackaged the products and/or reshipped the items to Lee in Hong Kong for further transshipment to Amir in Iran.   At times, the defendant would have the U.S. suppliers ship the products directly to Lee in Hong Kong, who would then ship the products to Amir in Iran.   In order to avoid detection by the U.S. suppliers and the U.S. Government, the defendant and his coconspirators concealed the true identity of the ultimate end-users in Iran of the U.S.-origin goods.   The defendant knew that the export and re-export of these U.S.-origin goods to Iran without a U.S. export license was unlawful. Accordingly, Mr. Shemirani willfully exported goods to Iran in violation of the law, and, as the Court is aware, such activities implicate both the national security and the foreign policy of the United States.

On January 25, 2013, the defendant pleaded guilty pursuant to a Rule 11(c)(1)(B) plea agreement to Count One of the superseding indictment charging him with conspiring under 18 U.S.C. § 371 to violate IEEPA.   The Probation Office has determined – and the parties agree – that the defendant's adjusted Guideline offense level is 23 pursuant to § 2M5.1(a)(1) and §3E1.1(b).   With a criminal history score of zero, the defendant's guideline imprisonment range is 46 to 57 months.   Contemporaneously with this memorandum, the government is filing a motion for a downward departure from the defendant's recommended Guidelines sentencing range pursuant to § 5K1.1 of the Guidelines based on the defendant's substantial assistance.   For the reasons articulated in that motion, the government believes that Mr. Shemirani deserves some sentencing consideration. Specifically, the government requests a 3-level downward departure (to a level 20), which would place the defendant in a guideline imprisonment range of 33 to 41

months.  Based on an analysis of the factors identified in 18 U.S.C. § 3553(a), the government

asks that the defendant be sentenced to 36 months incarceration.

## Mr. Shemirani's Unlawful Export Scheme

The items purchased by the defendant on behalf of the conspiracy included high

performance electronic power equipment such as field programmable microchips, acceleration

sensor semi-conductors, analog converters, and other testing and power equipment.  Shemirani

obtained a significant portion of the U.S. origin products he purchased on behalf of the conspiracy

through the commercial internet site eBay, and at other times contacted companies directly in an

attempt to acquire export controlled goods.  The defendant's brother and coconspirator, Amir,

would email the defendant a detailed list of the electronic components he sought and the

companies from which the goods were available.  After placing a bid or purchase order on eBay

or directly with a company, the defendant would then negotiate with the seller of the items to have

his purchases shipped to Hong Kong.  For example, on March 1, 2010, the defendant wrote to an

eBay seller located in the U.S. asking to purchase three electronic products for shipment to

coconspirator Lee's address in Hong Kong.  After receiving notification from eBay that he was

the winning bidder, Shemirani contacted the selling company, located in Maryland, about his

purchase and discussed shipping costs.  Thereafter, coconspirator Lee wrote to coconspirator

Amir in Iran stating that he had received items from the company in Maryland.  On March 29,

2010, in response to the above communication, Amir in Iran sent an email to the defendant stating,

"We got the attachment items from your side . . . I need to clear this case today and arrange air

shipment for this part to Iran!"

In other instances, the defendant would have the items shipped to him in Canada, where he

3

would then send the products to Hong Kong for transshipment to Iran.  In February 2010, the defendant submitted a price request for microchips directly to an electronics company located in Texas ("Texas company").   While still in the process of confirming the order, coconspirator Lee informed the defendant that the microchips were export controlled by the "USA government" and the factory will need to know the identity of the end user because "they want to control" where the parts will be used.  After receiving that email from his coconspirator, the defendant falsely informed the Texas company that the parts would be used by his employer in Canada.  He further falsely explained that he was not using the company credit to pay for the order "due to financial complications" arising from the fact that the parts "will be used in other lab environment."  The defendant later submitted an end-use certificate to the Texas company claiming that the end use and ultimate destination of the product was "Lab Environment, Montreal, Quebec Canada." After the defendant wired a total of $83,729.26 to the Texas company, the company exported the export controlled microchips to the defendant in Canada, where he then caused them to be transshipped to Iran through Hong Kong. Notably, these microchips are controlled technology and are on the Commerce Controlled List.   These particular microchips are controlled for national security reasons.

In total, the defendant purchased approximately 3,695 electronic components with a total cost of $187,305 that were then illegally exported to his brother Amir in Iran.  The massive number of parts shows that the defendant's actions were not an isolated act.  Rather, he, his brother, and Adam Lee participated in an ongoing, lengthy scheme in order to illegally export U.S. goods to Iran in clear violation of United States export laws. The commodities are of a dual-use nature and may well have been procured on behalf of military or government end users.    Given

4

the number and value of electronic components exported during the course of the conspiracy, the government simply cannot state with certainly who the ultimate end users of these electronic components were, although we cannot rule out that they were used by both the Iranian government and military. Due to the nature of the violation and the loss of control beyond our borders, it is often difficult to identify the true and final end destination and end use of U.S. commodities destined for Iran.

For these reasons and for any other reasons that may be cited at the sentencing hearing, the United States asks the Court to sentence Mr. Shemirani to a term of 36 months incarceration.

## Statutory Framework

IEEPA gives the President of the United States broad authority to regulate exports and other international transactions in times of national emergency.  See 50 U.S.C. § 1702(a)(1). IEEPA controls are triggered by an executive order declaring a national emergency based on an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."  See 50 U.S.C. § 1701.  Executive orders issued under IEEPA may impose broad trade restrictions against a particular country that bar U.S. persons from engaging in a broad range of transactions involving the offending foreign government or its nationals, unless specific government authorization is obtained in advance.

On March 15, 1995, the President issued Executive Order 12959, which continued previously-issued executive orders, in declaring a national emergency with respect to Iran and the Government of Iran.  The executive order was issued based on presidential findings that the policies and actions of the Government of Iran constitute a threat to the national security of the

5

United States due to Iran's support of international terrorism and its attempts to acquire weapons of mass destruction.   The same or similar presidential findings have been made each successive year, up to the present date.   On May 6, 1995, under executive IEEPA authority, the President declared a trade embargo against Iran, prohibiting the export from the United States to Iran of any goods, technology or services, with limited exceptions for publications, other informational materials, and donated articles such as medical supplies intended to relieve human suffering.   On August 17, 1997, the President reiterated and renewed the embargo by issuing Executive Order 13059, which remained in effect during the period of the instant offense.

In September 1995, the Office of Foreign Assets Control (OFAC) within the Department of the Treasury issued regulations implementing the executive order and trade embargo (the "Iranian Transactions Regulations" or "ITR"[1]).   See 31 C.F.R. § 560 et seq.   These regulations prohibit the export of goods or services from the United States to Iran without obtaining a license from the Department of the Treasury.   The ITR further prohibit certain commercial transactions by United States persons that involve persons in Iran.

At no time relevant to the indictment did the defendant and his coconspirators apply for, receive, or possess a license or authorization from OFAC to export goods, technology, or services, of any description, to Iran.

### Argument

A.    Legal Standards

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court ruled that the United States Sentencing Guidelines are no longer mandatory.   However, "[a]s a matter of administration

---

[1] Although they have recently been renamed the "Iranian Transactions and Sanctions Regulations" or "ITSR," at all times relevant to this prosecution, the regulations were titled the "Iranian Transactions Regulations" or "ITR."

and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining the defendant's sentence.   Gall v. United States, 128 S.Ct. 586, 596 (2007).   While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," Kimbrough v. United States, 128 S.Ct. 558, 564 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" id. at 574 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)).   The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"   Kimbrough, 128 S.Ct. at 562-63 (quoting Rita v. United States, 127 S. Ct. 2456, 2465 (2007)).   As one member of this Court has held, "Booker requires judges to engage in a two-step analysis to determine a reasonable sentence."   United States v. Doe, 413 F. Supp.2d 87, 90 (D. D.C. 2006) (Bates, J.)

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines.   Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing sentence.

United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005).

When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives—that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the

defendant with needed educational or vocational training and medical care.  See 18 U.S.C. § 3553(a)(1) and (2).  In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

      B.      An Analysis of the Factors Enunciated in 18 U.S.C. § 3553(a) Demonstrates that a Sentence of 36 Months Incarceration for Mr. Shemirani Is Appropriate

           1.     The Nature and Circumstances of the Offense

The Sentencing Commission has reflected the seriousness of violations of the Iranian embargo by assigning a base offense level of 26 to all export offenses that implicate national security concerns, and by not differentiating among those offenses according to the nature of the goods involved.  Courts have held that the nature of the goods being exported is immaterial in that "any violation of the embargo inherently" involves the United States' national security.  U.S. v. Hanna, 661 F.3d 271 (6th Cir. 2011) (emphasis added) (defendant's shipment of telecommunications and navigation equipment to Iraq in violation of the IEEPA warranted the enhanced Base Offense Level of 26 under U.S.S.G. § 2M5.1); see also United States v. Min, 2000 WL 1576890, **2 (S.D.N.Y. 2000) (defendant's violation of embargo against North Korea warranted application of U.S.S.G. § 2M5.1(a)(1) because "[t]he nature of the goods, innocuous or other, is not controlling").

The United States respectfully submits that the Court should give considerable weight to the Sentencing Commission's determinations regarding the seriousness of the offense in fashioning the sentence.  After all, such determinations are within the expertise of the Executive Branch of the United States Government.  See United States v. Martinez, 904 F.2d 601 (11th Cir. 1990) ("Questions concerning what perils our nation might face at some future time and how best

to guard against those perils are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.")   The Executive Branch has determined as a matter of foreign and national security policy that the threat posed by the government of Iran is so severe that only a complete trade embargo is adequate to protect the interests of the United States. Congress has acted in kind, recognizing repeatedly the threat posed by Iran.  See Iran Freedom Support Act, PL 109-293 (HR 6198) September 30, 2006; see also Iran Sanctions, Accountability, and Divestment Act of 2010, P.L. 111-195 (HR 2194) July 1, 2010.

Shemirani's activities in exporting over 3,500 items to Iran as part of the conspiracy demonstrate that he repeatedly undermined the trade embargo and the President's declaration that the actions of the Government of Iran constitute a threat to the national security of the United States.

### 2.   The History and Characteristics of the Offender

The government recognizes that Mr. Shemirani is well-educated and well-mannered and has a steady employment history.   Additionally, he has no known prior criminal convictions. Although these factors would normally weigh in his favor by the Court when fashioning its sentence, his education and employment history should not do so here since the defendant used his education and employment to further the illicit ends of the conspiracy by, for example, using his place of employment in Canada as a vehicle to mask the fact that the end users of the goods were located in Iran.

3.      The Need to Promote Respect for the Law, to Provide Just
        Punishment, to Afford Adequate Deterrence, and to Protect the Public

Deterrence and promoting respect for the law should be the principal goal of the Court's

sentence here.   Sentences in white-collar cases, arguably more so than in any other area in

criminal law, can have a significant deterrent effect.   A sentence of incarceration will serve as a

warning to anyone currently ignoring or tempting to ignore U.S. export laws seeking to protect our

own national security.   Through its just punishment of the defendant in this case, the Court can

send an appropriate message to others who might violate U.S. laws that export violations are – as

Congress and the President intended them to be – grave matters that warrant real punishment.

The sentence that the government is advocating, which includes a reduction in time for his

cooperation, will have that result.

4.      The Need to Provide the Defendant with Educational or
        Vocational Training

Mr. Shemirani does not need any such training.

5.      The Need to Avoid Unwarranted Sentence Disparities Among Defendants
        with Similar Records Who Have Been Found Guilty of Similar Conduct

The starting point in the Court's analysis under § 3553(a)(6) is the sentences of

"defendants with similar records who have been found guilty of similar conduct."  18 U.S.C.

§ 3553(a)(6).   A sentence of 36 month, when incorporating the United States' §5k1.1 Motion, is

consistent with sentences imposed on similarly situated defendants.   For example, in United

States v. Mohammad Reza Haijan, 08:12-cr-00177 (M.D. Fla.), the defendant pleaded guilty to

one count of conspiring under 18 U.S.C. § 371 to violate IEEPA for exporting computers and

computer related equipment to Iran, and was sentenced to 48 months' incarceration.   In United

States v. Laura Wang-Woodford, 03-cr-0070 (E.D.N.Y.), the defendant pleaded guilty to one

10

count of conspiring to violate IEEPA for her involvement in shipping aircraft component parts to Iran through other countries, and was sentenced to 46 months' incarceration, which was the upper range of the stipulated 37-46 months contained in the parties' plea agreement.  See also United States v. David McKeeve, 131 F.3d 1 (1st Cir. 1997) (51 month sentence in an IEEPA prosecution for sending computer products to Libya in violation of embargo).[2]  In United States v. Michael Edward Todd, 05:10-cr-0058-1 (M.D. Ga.), the defendant pleaded guilty to one count of conspiring under 18 U.S.C. § 371 to violate IEEPA and the Arms Export Control Act for exporting military aircraft equipment to Iran, and was sentenced to 35 months imprisonment.   The 35-month sentence took into account the defendant's substantial assistance in the lure and arrest of a co-defendant.   Michael Todd's co-defendant, who also assisted in the lure and arrest of an Iranian procurement agent, was sentenced to 56 months imprisonment. See United States v. Hamid Seifi, 05:10-cr-0058-3 (M.D. Ga).

Although Shemirani's sentencing memo cites to an extensive list of cases, the vast majority are inapposite.   Three of the four cases that Shemirani cites from this Court do not involve violations of U.S. export law.   See Def. Memo at 17-18.   Three other cases cited by Shemirani concern guilty pleas to making a material false statement.   See Def. Memo at 18-20.   Shemirani also relies on cases involving extensive cooperation from defendants that far exceed what Shemirani has provided in the instant matter.   For example, in United States v. Kraaipoel, 09-cr-219, Dkt. No. 23 (D.D.C. 2012), the defendant's cooperation led to two arrests and convictions.   Moreover, in Kraaipoel the government recommended probation.   Likewise, in United States v. Gopal, 07-cr-0292, Dkt. No 22, (D.D.C. 2008), also cited by Shemirani, the

---

[2]  Significantly, McKeeve used the pre-2001 version of § 2M5.1(a)(1) and § 2M5.2(a)(1), which had a base offense level of 22.   The sentences would undoubtedly be higher today, with the higher base offense level of 26.

government recommended probation due in part to the defendant's invaluable assistance in obtaining the conviction of the lead defendant.   In the instant matter, Shemirani's cooperation, as outlined in the Government's Motion for a 5K, does not begin to rise to the level of assistance provided by the defendants in these cases.

## Conclusion

For the foregoing reasons, the Court should depart from the defendant's sentencing guidelines range of 46 to 57 months to reflect the substantial assistance he provided to the government.   That post-departure sentencing range, however, should adequately balance rewarding Mr. Shemirani for his substantial assistance to the government and, at the same time, fashioning a sentence with sufficient deterrent effect that reflects the serious nature of his crime and that is consistent with sentences received by similarly situated defendants.   Specifically, the government recommends that the Court sentence the defendant to 36 months, which reflects a 3-level downward departure from the Guidelines range for his criminal conduct.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney
D.C. Bar No. 447889

By:    _Courtney Spivey Urschel_
Courtney Spivey Urschel
Assistant United States Attorney
New York Bar
National Security Section
United States Attorney's Office
555 4th Street, N.W., 11th Floor

12

Washington, D.C. 20530
courtney.spivey@usdoj.gov
(202) 252-7705

*Brandon Van Grack /esu*

Brandon L. Van Grack, Trial Attorney
D.C. Bar Number 980288
National Security Division
U.S. Department of Justice
600 E Street, NW
Washington, D.C.   20004
Phone:   (202) 233-2252
Brandon.Van.Grack@usdoj.gov

### Certificate of Service

I, Courtney Spivey Urschel, certify that I caused to be served a copy of the foregoing by electronic means on counsel of record for defendant Shemirani on August 8, 2013.

*Urschel*

Courtney Spivey Urschel